IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

VICTOR TRUJILLO,

    Plaintiff,

    vs.                                    Civil No. 15-00544 WJ-SMV

MANAGEMENT AND TRAINING CORPORATION;
LARRY MONKS (Head of Medical Unit at
Otero County Detention Center), in his individual and
official capacities; JAMES FRAWNER (Warden), in his
individual and official capacities; RAUL URBINA;
and HECTOR NARANJO LOPEZ,

    Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

THIS MATTER comes before the Court upon a Motion for Partial Summary Judgment on Plaintiff's 42 U.S.C. §1983 Eighth Amendment Claim (Counts I and II) and Punitive Damages (Count V), filed on March 3, 2016 by Defendants Management & Training Corporation, Larry Monks, James Frawner, Raul Urbina, Melissa Wisdom and Hector Naranjo Lopez (collectively "Defendants") (**Doc. 50**). Having reviewed the parties' briefs and applicable law, the Court finds that Defendants' motion is not well-taken and, therefore, is **DENIED.**

### BACKGROUND

This is a case alleging a denial of medical care. Plaintiff is an inmate at the Otero County Prison Facility ("OCPF") located in Otero County, New Mexico. He claims that Defendants negligently failed to timely diagnose his broken metacarpal bone and that this delay resulted in the need for hand surgery. On December 31, 2014, Plaintiff had an altercation with another

inmate which caused him to break the fourth metacarpal of his right hand. Plaintiff was immediately escorted to the prison facility and given ice and ibuprofen to treat the injury, but he did not get an x-ray until February 4, 2015 despite his numerous requests to see medical personnel due to the pain and swelling in his hand. He alleges that he could have avoided surgery had he received proper medical treatment at OCPF, and that as a result of the surgery, he has a deformity of his hand and finger which might be permanent. Additionally, Defendant alleges that he may never be able to close his fist or regain the original strength in his hand. Defendants contend that the Plaintiff cannot establish the necessary components of a denial of medical care claim under the Eighth Amendment because his injury is not "sufficiently serious," or that Defendants were deliberately indifferent to his constitutional rights.

Counts I and II are brought under 42 U.S.C. §1983. Count I alleges a denial of medical care and treatment against all Defendants. Count I states that Defendants "ignored the obviously serious medical needs of Plaintiff" and "placed him at risk of substantial and life-long physical harm." Am. Compl., ¶ 41. This language can be read to assert a claim against the individual Defendants for alleged unconstitutional conduct. At the same time, Count I appears to include a claim for liability on the part of Defendant Management and Training Corporation ("MTC") because it can fairly be read to assert the existence of a "custom, policy, or practice of acting knowingly and with deliberate indifference in denying obviously necessary medications, medical services, and hospitalizations to inmates at Otero, including Plaintiff." Am.Compl., ¶ 39.[1] Count II asserts a §1983 claim against all Defendants under the Eighth Amendment for failure to

---

[1] Because ¶39 in the Amended Complaint does not specify the nature of claims asserted against the different Defendants, the Court can only assume, based on the nature of Plaintiff's assertions, that Count I alleges claims against the individual Defendants as well as the MTC. If the Court's assumption is accurate, then Count I should have been pled as two separate counts, and should have specified which Defendants are involved in which alleged conduct. Based on the pleadings, Defendants appear to assume that Count I alleges the underlying unconstitutional conduct while they treat Count II as a claim against MTC based on a failure to train and supervise. *See* Doc. 50 at 14. This assumption serves adequately for the Court to be able to address Defendants' motion.

train and supervise, alleging also that Defendant MTC's policies and customs in failing to train and supervise its employees caused Plaintiff's injuries. The claim also states that individual Defendants Frawner and Monks had "inadequate experience and training in the administration of the health services and medical centers." Am.Compl., ¶ 51.

Counts III, IV and V are state law claims alleging negligent medical care and treatment; negligent hiring, training and supervision, and outrageous conduct, respectively.[2]

**I.      Facts**[3]

On the day Plaintiff was injured due to an altercation with another inmate, Plaintiff was seen by OCPF Staff Nurse Ott. On examination, Nurse Ott observed that Plaintiff's right hand was swelling and had a purple discoloration. Based on the symptoms she observed, Ms. Ott applied ice to Plaintiff's hand. According to the testimony of Dr. Naranjo Lopez, M.D., the medical doctor employed by MTC to provide health care to inmates, OCPF has a protocol which provides that licensed vocational nurses ("LVN") see the patient and then book the patient with Dr. Lopez if necessary. The medical staff is required to follow this protocol through use of a standardized MTC form used for sick call requests, which provides referral to a medical doctor ("MD"), physician's assistant ("PA") or nurse practitioner ("NP") if the patient has an obvious deformity, tenderness, or edema. *See* Doc. 50-1, MTC000085-86.

The following day, January 1, 2015, Plaintiff was seen by LVN Melissa Wisdom, a defendant in this case. Ms. Wisdom observed swelling on Plaintiff's hand and a limited range of

---

[2]  Plaintiff frames Count V as a "State Law Claim for Outrageous Conduct Against All Defendants" but Defendants view Count V as a claim for punitive damages. The Court is skeptical of characterizing a *state law* claim as a basis for punitive damages in connection with a violation of *federal* constitutional rights. For purposes of this Order only, the Court will refer to Count V as a request for punitive damages.

[3]  The facts presented here are undisputed unless indicated otherwise. The Court will not refer to specific supporting exhibits unless necessary for clarification, since references are available in the pleadings. Also, Plaintiff presents additional facts in the section responding to Defendants' facts and also in a separate "additional facts" section, which makes the pleading unwieldy and difficult to follow. For ease of reading, the Court includes some of Plaintiff's additional facts, if material, where relevant as part of this factual presentation.

motion and she testified that she did not refer Plaintiff to a physician because she "just thought it was swelling." Doc. 50, Ex. 1 at 17:19-23. Ms. Wisdom treated Plaintiff's hand by applying ice and giving him Tylenol. Ms. Wisdom completed the sick call request form after treating Plaintiff, checking a box on the form that noted a "deformity" in Plaintiff's hand based on the swelling that she observed. Ms. Wisdom did not refer Plaintiff to Dr. Lopez on January 1, 2015 because she believed that Plaintiff's hand swelling would decrease within a few hours. An MTC "wound care sheet" indicates that Plaintiff's hand was iced every day for five days, and that purple discoloration of Plaintiff's hand was noted on January 3 and 4, 2015. Doc. 50-1 MTC000079. On January 5, 2015, the sheet notes that wound care was complete. *Id.*

Plaintiff submitted a sick call request on January 11, 2015 and he was seen by Nurse Raul Urbina, also a defendant in this case. Mr. Urbina observed swelling in Plaintiff's hand and that Plaintiff had full range of motion in his hand. He also noted on the MTC form that Plaintiff's hand had an obvious deformity, tenderness, swelling, that movement causes aggravation, and pain of six out of ten. *See* Doc. 50-1, MTC 000085. Mr. Urbina gave Plaintiff Tylenol.

On January 21, 2015, Plaintiff approached Larry Monks, director of the medical unit, during "mainline" and told him that he believed his hand was broken. "Mainline" refers to time that was set aside at OCPF once a week at lunchtime to allow inmates to approach prison administrators and have questions answered or make statements. This process allowed prison administrators to find out things "that maybe slipped through the cracks." Doc. 50-3 at 74:1-7. Defendant Monks stated that Plaintiff told him that he had injured his hand and that he wanted to know why x-rays were never done. Defendant Monks pulled his chart and confirmed that there were no x-rays that were ordered and that no referral had been requested. Ex. A, 74:7-75:10.

4

Monks immediately referred Plaintiff to Dr. Lopez who saw Plaintiff that same day, January 21, 2015, in the OCPF medical department. Dr. Lopez ordered an x-ray to determine whether Plaintiff had a fracture. Doc. 50, Ex. 1, MTC000089. X-rays ordered by Dr. Lopez had to be approved by the Department of Corrections. On January 28th, Plaintiff was seen again by Dr. Lopez for a follow-up appointment, at which time Dr. Lopez repeated the request for an x-ray "just to be sure" that the x-ray ordered on January 21st "would be done." Doc. 52-3 at 99:3-8. The authorization for the x-ray was not received until January 29th and an x-ray was not performed until February 4, 2015. *Id.* at 98:1-23. As soon Dr. Lopez received Plaintiff's x-ray results, Plaintiff was referred to an orthopedic doctor at University Medical Center in El Paso. Plaintiff received a second x-ray on February 5, 2015 at University Medical Center in El Paso, and was referred by University Medical Center doctors to be treated at Texas Tech Orthopedic. Plaintiff was seen by a specialist at Texas Tech Orthopedic on April 27, 2015 and a surgery was scheduled. The surgery was performed by Dr. Miguel Pirela-Cruz, on June 19, 2015.

Due to severe stiffness in Plaintiff's hand, Dr. Cruz ordered occupational therapy after surgery and referred Plaintiff for these services. Ex. J, MTC 212, 163, and 170. Despite this direct order from Plaintiff's surgeon and the need for said therapy Plaintiff was never given this care. Dr. Lopez never spoke to Dr. Cruz, but he received Dr. Cruz' referral report. Ex. C at 101. Dr. Lopez was not aware if Plaintiff ever received the post-surgery services recommended by Dr. Cruz, but assumed that he had not, since OCPF did not have occupational therapy services at the facility. Ex. C at 102. Dr. Lopez had the authority to ensure that Plaintiff got this care by contacting the Department of Corrections and requesting that it be provided at a New Mexico hospital, but this was not done. Exhibit C, 101:20-104:13.

Plaintiff, by his own count, was seen by OCPF medical professionals on at least seven (7) different occasions between the time of his injury on December 31, 2014, and January 25, 2015, the date of Plaintiff's sick call request. Doc. 53-2, Ex. 2. Plaintiff was referred for care by non-OCPF, outside medical providers on at least three separate occasions.

## II.     Legal Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial; the nonmoving party may not rest on mere allegations or denials in her own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). In order to avoid summary judgment, the nonmoving party must set forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor. *Id.* at 249. A mere scintilla of evidence in the nonmovant's favor is not sufficient to defeat a motion for summary judgment. *Id.* at 252. Rather, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (citation omitted).

## DISCUSSION

Defendants seek dismissal of Counts I and II which are based on allegations of an Eighth Amendment violation, and Count V which purportedly seeks punitive damages. The Eighth Amendment provides prisoners the right to be free from cruel and unusual punishments. This

right is violated if prison officials show "deliberate indifference to an inmate's serious medical needs." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). However, medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). A prison official does not violate an inmate's Eighth Amendment rights "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To make out a constitutional deprivation under the deliberate indifference standard, plaintiffs must prove two elements: (1) objectively, the inmate's medical needs were "sufficiently serious," and (2) subjectively, the prison official acted with a "sufficiently culpable state of mind." *Id*. at 1230-31; *see also Mata*, 427 F.3d at 751.

Negligence is insufficient to prove deliberate indifference. *See Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) ("Negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a[n Eighth Amendment] constitutional violation."); *see also Estelle v. Gamble*, 429 U.S.at 105 (negligence in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Also, mere delay in medical treatment does not constitute a constitutional violation unless it can be shown that the delay was the result of deliberate indifference and resulted in substantial harm. *See Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993). This is true whether the indifference is manifested by prison doctors responding to the prisoner's needs or by guards' intentionally delaying or denying access to medical care that has been prescribed. *See Estelle v. Gamble*, 429 U.S. at 104-106.

**I.        "Sufficiently Serious"**

A claim is objectively cognizable when the resultant harm is "sufficiently serious" to constitute cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. at 824; *Martinez v. Beggs,* 563 F.3d at 1088; *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir.2005). Defendants contend that Plaintiff cannot meet this objective requirement.  A medical need is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).

　　　　A.        Evidence of "Sufficiently Serious" Injury

Defendants contend that Plaintiff's hand injury is not "sufficiently serious" under *Farmer's* objective component.   In support of this contention, they rely on case law where the injuries at issue were at opposite ends of the "seriousness" spectrum.   In *Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000), the injury was deemed sufficiently serious where a doctor failed to recognize that an inmate was having a heart attack.  *Id.* at 1208.[4]  Defendants also cite to *Richardson v. Daniels*, in which the Tenth Circuit concluded that the inmate plaintiff had suffered "only minor abrasions and skin breaks" as a result of being dragged out of his cell while he was in the midst of a seizure.  557 Fed.Appx. 725, 727 (10th Cir. 2014).  Plaintiff's hand injury was not as profound as the heart attack in *Sealock* but would seem to be considerably more serious than the minor the abrasions and skin breaks that occurred in *Richardson.*

---

[4]  Defendants rely on *Sealock* to state that the objective component "is established where prisoners' medical conditions were potentially *fatal* if not properly treated." Doc. 50 at 7 (emphasis added).  While the facts in *Sealock* did involve a potentially fatal injury, the objective component in *Farmer's* does not require that the injury actually be *fatal* if not treated appropriately.

8

Plaintiff offers evidence concerning the nature of his injury, and the Court finds that this evidence creates a dispute of fact as to whether his injuries meet the "sufficiently serious" objective element in *Farmer's*. Soon after the injury occurred on December 31, 2014, Plaintiff presented with symptoms that merited attention by a physician, according to MTC's own standard sick call request forms.

Dr. Lopez first became aware of Plaintiff's injury as early as the day after it happened, on January 1, 2015. He was not working over the New Year's holiday, but was available by phone, and approved the medical unit's request for an order for ibuprofen by phone. Doc. 52-3 at 44-46. This allowed the medical unit staff to go ahead and give Plaintiff the medication prior to Dr. Lopez had signed the order. Dr. Lopez stated that if the situation were more serious, the nurse would have called him. Doc. 52-3 at 46:18-20. Instead, Dr. Lopez saw this as a routine pain request, and though it was just another inmate asking for pain medication in order to avoid having to buy it from the commissary. *Id.*

On this January 1st visit to the medical unit, Ms. Wisdom saw that Plaintiff's hand was "swollen and raised." Doc. 50-2 at 15. As part of her assessment, she checked the boxes next to "obvious deformity," "edema to affected extremity," and "decreased range of motion to affected extremity." Doc. 50-1, MTC000080. Immediately below that section is a section for "Assessment Decision" which directs the health care provider to "Contact of Refer to MD/NP/PA" if certain findings were present, such as "obvious deformity or discoloration," "decreased mobility, or "red or edematous joint." *Id.* When asked why she didn't continue to that part of the form and fill in those boxes, Ms. Wisdom stated "I don't think I saw that" but conceded that she *should have* checked those boxes which would have directed her to refer Plaintiff to a doctor. Doc. 50-2 at 15-16.

9

Thus, even though MTC's standard form includes a procedure which directs MTC staff to refer to a physician when certain findings were present, and even though such findings *were* present in this case (obvious deformity, decreased mobility and edema), a referral was not made. In his deposition, Dr. Lopez confirmed that if physician box is checked on the form, then he would be made aware of the medical situation by referral.  If the box is not checked, Dr. Lopez would not be notified.  Doc. 52-3 at 66-67.  This evidence would allow a reasonable juror to find that the signs and symptoms of Plaintiff's injury were sufficiently obvious as requiring a doctor's attention and thus would allow a finding that the injury was a "sufficiently serious" injury under the first prong of an Eighth Amendment analysis.

Plaintiff presents other evidence from which a reasonable juror could find that his hand injury was serious enough to warrant a physician's attention.  Prior to approaching Larry Monks during "mainline" on January 21, 2015, Plaintiff's injured hand was treated for a month with ice packs and Tylenol.  Monks reviewed Plaintiff's medical chart and saw notations that Plaintiff was unable to move his hand that the hand appeared to be dislocated, which caused Monk some concern.  Doc. 50-3, Ex. 3 at 75.  Monk's immediate reaction was to refer Plaintiff to Dr. Lopez and was seen by Dr. Lopez on the same day, when Plaintiff's injury was diagnosed as a possible fracture for the first time and an x-ray was ordered.

B.     Medical Expert Testimony

Both parties rely on the testimony of their medical experts who provided opinions based on their review of Plaintiff's medical records.   While no challenge has been made under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Court is nevertheless assigned the gatekeeping function to ensure that scientific testimony is both reliable and relevant. 509 U.S. 579, 597 (1993).  Neither party includes any documentation as to their expert's qualifications and

experience.  Defendant's expert, Matthew Patton, M.D., includes some information on his qualifications as an orthopedic surgeon in New Mexico Orthopedics.  Doc. 53-3, Ex. 3.  Dr. Patton refers to a CV, which is supposedly attached as an "Exhibit A," but the Court can find no such exhibit attached to the pleadings.  Plaintiff's expert, Deanna Mercer, M.D., is described as an "orthopedic surgeon" but provides no other information on her background or experience.  Doc. 52-5, Ex. E.  Neither party raises an objection as to qualifications, and based on the available record, the Court finds no impediment to either expert's ability to offer an opinion on matters relating to a standard of care for treatment of orthopedic or hand injuries.   The Court also finds these expert reports to be relevant to issues of the seriousness of Plaintiff's hand injury as well as the significance of a delay in treatment.

      Plaintiff relies on testimony by Dr. Mercer whose opinion suggests that earlier treatment would have been more successful than the treatment Plaintiff actually received.  She noted that Plaintiff had certain functional deficits in his hand, including extensor lag and an inability to make a full fist.[5]  Doc. 52-5, Ex. E at 5.  Dr. Mercer stated that it is "customary to obtain x-rays within a few days" after an injury and that the usual treatment for 4th metacarpal fractures is "initial management in an emergency room with closed reduction and splinting, followed by close surveillance with repeat x-rays every week."  Doc. 52-5, Ex. E.  Dr. Mercer opined that if surgery is necessary, it was "recommended within the one to two weeks after the initial injury while the fracture is still fresh" and that if a fracture heals in a "malunited position," an osteotomy would be necessary, which is the procedure performed on Plaintiff's hand.  *Id.*  According to Dr. Mercer, Plaintiff's fracture was healed by the time he was seen by a hand surgeon, requiring that a plate be inserted into the hand instead of "K-wires" which could have

---

[5] "Extensor lag" refers to "the amount of drooping at a weakened joint that can extend only passively, no longer actively."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 2011 Ed.

11

been used as part of earlier intervention to maintain alignment and then later pulled once the fracture heals.  The gist of Dr. Mercer's opinion is that earlier treatment would have resulted in less invasive treatment options and would have minimized the need for surgery as well as the potential for functional deficits as a result of failure of the bones to maintain alignment.

While Defendants do not object to Dr. Mercer's qualifications as an expert, they do dispute the materiality of Dr. Mercer's opinion because the opinion "incorrectly assumes that an accurate diagnosis occurred with a few days of Plaintiff's injury," where a correct diagnosis "did not occur until January 21, 2015."  Doc. 53 at 4, Resp. to P's Add'l Fact 14.   This is a curious sort of objection, since the fact that Plaintiff's injury was not actually diagnosed until one month after it occurred is not really helpful to Defendants' position.  The Court overrules Defendants' objection on materiality grounds since any issue Defendants have with Dr. Mercer's testimony goes to weight rather than admissibility.

Defendants' expert, Dr. Patton, opined that no surgeon can know whether earlier treatment would have been more successful than the treatment Plaintiff received.  Doc. 53-3, Ex. 3.  Dr. Patton came to several conclusions: (1) that Plaintiff could have done well without surgery; (2) that there was no guarantee that had Plaintiff been seen immediately by a doctor, a reduction would have been successful;[6] (3) that Plaintiff's delayed surgical treatment will not affect his long-term outcomes, meaning that there are no expected differences if the surgery was done one week or twelve months after the injury; and (4) that that there are no expected differences between the long-term outcomes of use of a K-wire to reduce and stabilize a fracture, or an osteotomy to realign a bone segment and hold it in place with metal plates and screws.  Doc. 52, Ex. 3 (Patton opin.).

---

[6] "Reduction" is the "restoration, by surgical or manipulative procedures, or a part to its normal anatomic relation." STEDMAN'S MEDICAL DICTIONARY, 28TH Ed.

Both Dr. Mercer and Dr. Patton have presented facts that need to be considered and weighed by the fact finder and thus, the evidence presented by Plaintiff precludes summary judgment on whether his injury was "sufficiently serious" under *Farmer's* objective requirement for an Eighth Amendment violation. More specifically, Dr. Mercer's opinion creates a dispute of fact on this same issue because it supports Plaintiff's position that his injury was serious enough to require a doctor's attention, and that the delay in diagnosis and treatment resulted in substantial harm to Plaintiff. For summary judgment purposes, the Court finds that a dispute of fact exists as to whether Plaintiff has satisfied the "sufficiently serious" element in *Farmer's,* but would add that the evidence presented by Plaintiff on this element strongly weighs in favor of Plaintiff.

## II.   Scienter Element-Deliberate Indifference

Defendants argue that even if Plaintiff's hand injury is considered sufficiently serious to meet the *Farmer* objective requirement, Plaintiff's Eighth Amendment claim ultimately fails because he cannot meet *Farmer's* subjective requirement that a prison official knows of and disregards an excessive risk to inmate health. A prison official has a sufficiently culpable state of mind if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *Martinez v Beggs,* 563 F.3d at1089 (a claim is subjectively cognizable when prison officials "disregard the risk of harm claimed by the prisoner").

During Plaintiff's January 1, 2015 visit to the medical unit, Ms. Wisdom failed to complete the standard form used to assess inmate's injuries. Had she completed the entire assessment form, she would have been directed to notify a physician about Plaintiff's injury. Defendants characterize the basis for delay in Plaintiff's treatment as nothing more than negligence, but the evidence presented by Plaintiff suggests that what might have started out as

negligence progressed into something more egregious. Plaintiff was seen at the medical unit at least five times during the period from December 31, 2014 to January 12, 2015, each time presenting with pain and swelling in his right hand, and some loss of function to where he could not make a fist. *See* Doc. 50-1,Ex. 1, MTC000080, MTC000082, MTC000084, MTC000085. In addition, on his visits to the medical unit on January 3rd and 4th, when ice packs were applied to his hand for twenty minutes, "purple coloration" was noted on Plaintiff's hand. Doc. 50-1, Ex. 1, MTC000079.

Despite all these visits to OCPF's medical unit in January, it wasn't until Plaintiff saw Dr. Lopez on January 21, 2015 that an x-ray was ordered.[7] On January 25, 2015, Plaintiff requested to be seen again, expressing frustration that he had been seen on seven different occasions and was still could not make a fist with his hand. Doc. 53-2, Ex. 2, MTC000093. On the same form, LVN Mares responded "you were referred to x-rays [sic] on 1/21/15. We are pending an approval for this exam." *Id.* On January 28th, when Plaintiff saw Dr. Lopez again, the approval was still pending. Dr. Lopez repeated the x-ray request to make sure it would be processed.

Mere delay in medical treatment does not constitute a constitutional violation unless it can be shown that the delay was the result of deliberate indifference and resulted in substantial harm. *See Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993). Defendants claim that Plaintiff cannot prove deliberate indifference because Plaintiff was treated appropriately when Dr. Lopez

---

[7] There is a notation by Ms. Wisdom on the wound care sheet dated January 1, 2015 about a referral to x-ray on "1/1/15." Doc. 50-1, MTC000079. Also, in her deposition, Ms. Wisdom stated that she referred Plaintiff for an x-ray on that date, although any follow-up to that statement was not included in the deposition pages presented to the Court, Doc. 50-2 at 17:24, and Defendants do not include any mention of this x-ray referral either in their fact section or elsewhere in the discussion. Thus, it is not clear whether a referral for x-ray was actually made on January 1st or whether it was made but fell between the cracks even though Plaintiff made subsequent visits to the medical unit. Either way, the question remains the same—which is whether the delay in treatment was a result of deliberate indifference.

eventually learned of his situation. *Self v. Crumb,* 439 F.3d 1227, 1234 (10th Cir. 2006) (a culpable state of mind is not established where the doctor is mistaken in his or her diagnosis but where the diagnosis was objectively reasonable). However, this statement begs the question of whether up until then, the delay in treatment caused substantial harm to Plaintiff's hand and whether the delay was caused by deliberate indifference. It is undisputed that Plaintiff continued to suffer pain and limited use of his hands for months after the initial injury on December 31, 2014, and that an x-ray was not taken until early February 2015, even though the medical unit was aware of Plaintiff's symptoms and medical findings during his visits in January. A reasonable juror could find, based on the facts presented here and which must be viewed at this point favorably to Plaintiff, that Defendants were deliberately indifferent to obtaining a diagnosis and obtaining appropriate medical treatment for Plaintiff.

### III.     Failure to Train and Supervise

In Count II, Plaintiff alleges that MTC and its supervisory staff were deliberately indifferent to the adequacy of MTC's training program and that its failure to properly hire, train and supervise its employees caused Plaintiff's injury and sufficient. *See Zuchel v. City & County of Denver, Colo.,* 997 F.2d 730, 734-35 (10th Cir. 1993 (setting out elements of failure to train claim against municipality).[8]

Defendants move for summary judgment on this claim because there is no underlying constitutional claim. *See, e.g., Apodaca v. Rio Arriba County Sheriff's Dept*., 905 F.2d 1445, 1447 (10th Cir. 1990) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). This

---

[8] It is clearly established in the 10th Circuit, and by Supreme Court case law, that private actors (such as MTC) may be considered state actors for the purpose of §1983 when they are performing a public function or when they act in concert with the government, among other things. *See West v. Atkins,* 487 U.S. 42, 54-57 (1988) (holding that that a private doctor treating prisoners under a contract with state prison authorities acted under color of state law for purposes of § 1983 suit alleging Eighth Amendment violation); *see Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir.2006) (plaintiff required to establish Medical Center's independent liability based on a wrongful policy or custom); *Parker v. Gosmanova*, 335 Fed. Appx. 791, 794 (10th Cir. 2009) (holding that private medical facility may be held liable under §1983 because it contracted with the State to provide medical care to state prisoners).

assessment is obviously premature, because the Court has found that a material dispute of fact exists as to whether Plaintiff's Eighth Amendment rights were violated, and therefore Count II will proceed to trial. The facts in this case could suggest to a reasonable juror that MTC failed to adequately train its staff. *Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1240 (10th Cir. 1999) (Where a superior's failure to train amounts to deliberate indifference to the rights of persons with whom his subordinates come into contact, the inadequacy of training may serve as the basis for § 1983 liability). For example, a reasonable juror could infer that LVN Wisdom's failure to correctly fill out MTC's standard health care request form for Plaintiff was a result of inadequate training, and that inadequate training was behind the failure of other staff members to refer Plaintiff to a doctor on his subsequent visits, despite continued symptoms of pain and signs of edema, discoloration and functional loss of his right hand. *Cmp. Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992) (city could not be vicariously liable under §1983 for the constitutional torts of its agents, but is only liable "when it can be fairly said that the city itself is the wrongdoer"). Defendants are not entitled to summary judgment on Count II.

## IV.  Punitive Damages

Defendants' motion is also denied with regard to Plaintiff's request for punitive damages because disputes of fact exist as to whether Plaintiff's constitutional rights were violated, whether Defendants were deliberately indifferent to Plaintiff's constitutional rights and whether the level of scienter reaches the point where punitive damages would be appropriate.

## CONCLUSION

In sum, the Court finds and concludes that Plaintiff's injury could have been caused by more than negligence and a misdiagnosis, and that material disputes of fact exist as to whether Defendants violated Plaintiff's Eighth Amendment rights. Plaintiff has presented enough

evidence on the question of whether his injury was "sufficiently serious" as to preclude summary judgment for Defendant.

The Court also finds and concludes that, viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could find that Defendants were deliberately indifferent in obtaining a diagnosis and in providing medical treatment to Plaintiff. Whether a delay of several weeks in these circumstances constitutes deliberate indifference is a fact question for a jury. And whether the delay caused substantial harm to Plaintiff is also a fact question for a jury to consider, based on all the facts in this case as well as the medical testimony presented by the parties.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiff's 42 U.S.C. §1983 Eighth Amendment Claim (Counts I and II) and Punitive Damages (Count V) **(Doc. 50)** is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE